I would like to discuss about 8 sub-subjects in this matter. With the overall thoughts in mind that in this case there was prosecutorial misconduct, there was ineffective assistance of counsel, and there was judicial error. So as I go through each subject, you can see it through how each of the players in this process affected the outcome of the case. The subject matters I'd like to address, unless you want me to specifically address something, of course, are the Speedy Trial Act, the eyewitness identification procedures, and the result. The, what I refer to as the overkill testimony of the law enforcement officers, there were actually 11 of them in the government's case in chief. That is related to the suppression of the government's third party suspect evidence. And I would also like to discuss the, what I see as obstruction of justice with the government's star informant witness, Christy Sanchez. And then finally, I believe the 404B evidence and the jury instructions should not be forgotten at all in this case. I don't think this was an adversarial process at all. It wasn't even broken. It was just no adversarial process at all. The in limine motions, the pretrial ID suppression motion, and the trial, and the sentencing basically provided the government with a forum to announce its accusations against Giovanni Mendoza without using proper evidence, without providing proper evidence, and proceeding by proffer throughout much of the case, testifying for its own witnesses, not providing concrete actual evidence. They also, I would say, particularly in the pretrial motions, shifted, and throughout the trial, shifted the burdens of proof to Giovanni Mendoza to represent himself, to defend himself in the face of accusations that weren't founded on proper evidence and where he really had no assistance of counsel at his side. Also, I believe the standards of evidence were ignored throughout this case. I think it proceeded by proffer and innuendo. And I would ask your honors to rectify this. I'd asked for a new trial in the district court after I received the case as appointment on appeal. That was denied. I think it was largely denied just because the government kept arguing you cannot get a motion for a new trial based on impeachment Brady evidence or based on the fact that the, the defense, defendant received ineffective assistance of counsel. But I have cited repeatedly in my papers that yes, in fact, the Schaefer case, which has been cited various times throughout all these proceedings, you can get a new trial if you were convicted based on an informant's testimony where all the Brady impeachment material was not provided to the defense. And this court also decided the Tucker case, which comes out of Southern California, that of course, indeed, you can get a new trial if you received ineffective assistance of counsel, of course, provided there's enough evidence on the record that there was ineffective assistance of counsel. And I think the record in this particular case shows the vast amount of ineffective assistance of counsel. That being said, I think I will start with the Speedy Trial Act violation. You could decide this case right on the Speedy Trial Act. The arrest occurred August 24th. The incident occurred August 17th, 2005. By, I believe, September, the first attorney for Giovanni Mendoza, who was court appointed, she filed motions. All of them were heard, decided, done. No other issues were left out there by November 10th, 2005. Did he object to denial of speedy trial in front of the district court? No, he did not. What does that do for you? There is case, I believe, from this very court that says if your attorney has provided ineffective assistance of counsel by not asking for a speedy trial, it is not the defendant's fault. He should not be penalized because the court... You don't have a rule that says if you don't raise it, it's waived? The government argued that in their reply brief, but that's not true. It's not waived, and I've cited the cases in my response brief, in the very first topic I addressed. I think it's the Supreme Court, as well as the circuit, that says the attorney, nor the government, nor the district court can waive a person's speedy trial rights when he's been ineffectively assisted by his counsel. But his counsel asked for a number of continuances going forward, one after another, as I read the record. And in addition, wasn't there a defense motion that was pending before the court throughout that period of time? There was a defense motion for discovery that had been filed in September. This court says, I'm sorry, my materials here, I don't know where I put my speedy trial act arguments, but this court says even if there is a pending issue that needs to be resolved, there's only 30 days left that you can do that. They violated that. They kept all the parties, the defense attorney, the government, and the district court, they all used the excuse that there was a pending discovery motion on file. But there was no discovery dispute. There was nothing to decide. So the clock, I would argue, by March 13th or 15th, that was it. They had to have had the trial. There was nothing pending. Arguably, January 13th was the day they should have had the trial. But when the attorney came on to the case on November 10th at the end of the unduly suppressive identification hearing, he asked for time. It was a change of counsel. That's a legitimate reason to give somebody time. But he'd had two months. Now, the ineffective assistance of counsel is proven. The Metropolitan Correctional Center jail records show he never visited his client. This case had 1,500 pages of discovery. Numerous, numerous eyewitnesses. The attorney indicated, the first attorney indicated the defense was, I wasn't there, I wasn't the driver. And this case was not defended at all. And I think the record shows that. There's nothing, nothing filed on Mr. Mendoza's behalf, ever. Never, until the end of the case, when he was subjected to a 235-month sentence. There was a little sentencing memorandum that cited Booker. And I think that's all it cited. Nothing was done to defend the case. So, I don't see how the government can justify this violation of the Speedy Trial Act. And the evidence shows that the government was busy rounding up the witnesses and talking to them. We know that they met with Christy Sanchez at least three times in August. And they had a huge binational meeting with the material witnesses. With agents present. The government of the United States present. And the equivalent of the FBI from Mexico present. They refused to give us discovery on what happened during those meetings. How many pictures did they show of Giovanni Mendoza? What was said? We have no idea. But under the Hall case from this court, there's no legitimate excuse to postpone the trial so that they can gather up their cooperating witnesses to sink the defendant. That's not a legitimate excuse to postpone the speedy trial. I can't find any justification. And there's no case law. Even the government filing its in limine motions. It's been held, long held. A government's in limine motions will not postpone the Speedy Trial Act. And clearly it was done here for the benefit of the government attorney and his witnesses and his case. It was done for the benefit of the defense attorney who didn't want to work on the case. He kept postponing it. He's from San Fernando Valley, which is at least three hours probably from San Diego. He said he had no money. We have evidence in the record from Mr. Mendoza's mother and sister. He was complaining about money. We have receipts about how much money. He could not handle this kind of case. He basically received about $12,000. You can't defend this kind of case with $12,000. You have numerous government witnesses. You have numerous people that you need to interview. You have a site under dark conditions, preferably under the emergency conditions, to view. You have to talk to your client. You have to show your client what these witnesses are saying about him and how the Border Patrol manipulated their testimony on the DVD recordings. There is no way that Giovanni Mendoza was shown those recordings. He saw his attorney for 35 minutes in 2006. Thirty-five minutes, eight months. The other time he'd seen his attorney was in November 2005. A total of two and a half hours over 11. He was sentenced in December 2006. So a 14-month period. He saw his attorney for two and a half hours. Another part of this IAC is most of our practice involves mitigation. There was no mitigation done here. The attorney did nothing to refute the claim that this SUV deliberately smashed into the California Highway Patrol. Nothing. That increased his sentence about a decade. That is malpractice. He didn't contest it. Counsel, wouldn't it be more productive if we were to explore those issues in a habeas petition so that we could get counsel's version of what happened as opposed to trying to decide that here without having the benefit of counsel's response to those allegations? You can order that, Your Honor. I'd actually ask to be appointed habeas counsel. But that's a totally separate proceeding, though. We wouldn't do that on direct appeal, would we? Under the Miskinnis case and there's a series of cases, Geronimo, other series, other cases from this court. You can decide there was ineffective assistance of counsel on direct appeal. You have the ability to do it. I'm sorry. I'm sorry. We have the ability to do that, but generally we can't do that without at least getting the position of the attorney on the assertions that are made. You know, if somebody doesn't file an appeal, that's obvious. But short of that, it's really difficult, in my view, to decide an ineffective assistance of counsel claim on direct appeal. Well, Your Honor, you could certainly remand the case and ask us to do that if you want to keep it in this forum because there's so many appellate issues. It's kind of a strange situation. Just so that you know, when I looked at the case originally and I've continued to believe this, this record is enough. I don't think you need anything else. And this, nothing was done. He didn't even ask for evidence. He's a state law criminal practitioner. He should know to ask for the videos on the police cars, California Highway Patrol. You can take judicial notice. Everybody knows they have videos. Why weren't those shown? They're claiming they looked directly. One of the officers is claiming he looked directly at the car. They're looking directly at somebody jumping out of the suburban. They're saying it's Giovanni Mendoza. Why wouldn't he ask for that kind of evidence? Let's see. You don't have DNA? You don't have fingerprints? What? That's the point. He would be able to say whether he asked for it and why, if he didn't, why he didn't ask for it. And we would have a conclusion. And also why it matters. He may have failed to ask for the videotape, but you haven't gone the next step to show that, and had he seen the tape, he would have discovered A, B, C, and D. I think we should have the tapes. Well, that may be, but in order to have, what Judge Rollins' point is, in order to have effective assistance of counsel, a valid claim, you have to show more than that he didn't do something. You have to show not only did he not do something he should have done, but that had he done it, it would have made a difference. You can't get to the second stop without raising it below and showing what it would have shown and how it would have helped him. Okay. That's fair enough. I was thinking when the attorney told me that he didn't even bother to interview the material witnesses, the people that are accusing my client of being in this car and driving them, he didn't even interview them? That right there is all you need. No, it's not. In my mind, then I'm wrong. It's a two-step process. He didn't do A, and then because he didn't do A, they lost B. You've got A, but not B. Can you tell us, Ms. Bader, what evidence establishes the substantial likelihood that the material witnesses misidentified Mr. Mendoza? Yes, the eyewitness procedures used by the police themselves, their own reports, the Border Patrol's own reports, and the DVD recordings. And I just want to bring up the Perry v. New Hampshire case from the Supreme Court. That case says that the Supreme Court has reiterated that you can't, you don't automatically get a pre-trial unduly identification suggestive hearing. And even if you do, what it boils down to is did the police procedures that were used infect the process and produce irreparable identification? And these procedures that the government used, and that they actually did eventually show to the defense, show what they did. The one material witness who the government did not call out of the five at trial is seen on the tape saying, no, I don't identify anybody. Well, I might identify that person. And he says, isn't that the guy you're looking for? He says to the Border Patrol agent right next to him, and he says, the Border Patrol agent says, Giovanni? And he said, no, the other guy. Which means these Border Patrol agents have already told them who they're looking for. That's unheard of. I've never seen any cases where identification has been suppressed, where the agents have gone so far to say, this is who we're looking for. In Jackson v. Fogg, they brought the witnesses into the police station and said, the suspect might be right here, or that might be the suspect. That's bad. That is bad. And that was suppressed. But in this case, they were telling them who they were looking for. They gave them their names. Under current studies, and with the New Jersey Supreme Court case, and I believe in states such as Texas, Maryland, North Carolina, maybe Illinois, and the California Commission on the Administration of Justice have released guidelines that the police need to follow so that these irreparable identifications can't be seen. And in this case, the reports, and they're in the record, and they're in my reply brief. I wrote them verbatim what Agent Call did, the case agent, and Agent Rivera did with these witnesses. They kept saying, we're looking for people. We know these are dangerous driving alien smuggler organizations. Agent Rivera said in his report, I only knew Giovanni Mendoza and Martel Valencia out of all of these suspects that we were showing the witness. They're suggesting to these witnesses who to pick out. Your own evidence shows it. You've got about two and a half minutes left, and I'm sure you'd want to reserve some for rebuttal, wouldn't you? Yes, I haven't touched on barely anything. Thank you. Good morning. Good morning, Your Honor. Kyle Hoffman from the United States. I'd like to start with the Speedy Trial Act. Obviously, we believe the Speedy Trial Act was waived. There was no motion below. We think that makes a difference. I disagree with counsel that there was no dispute and no ongoing motion. As cited in our brief, what happened was first counsel for Mr. Mendoza asked specifically for the statements of Christy Sanchez, the ones in August 2005. And government counsel said, no, we're not giving those until right before trial. We don't think we have to give them until after she testifies under the Janx Act, but we'll give them right before trial. And that counsel then, the counsel for Mr. Mendoza at the time, didn't agree with that proposition. And the district court expressly said, I will reserve ruling on that issue. Okay, so that was a live dispute. Now, everybody knew at the time, though, that Mr. Martinez, next counsel in line, was coming on, and the district court essentially left it to him to either press that issue or not. But doesn't the clock start ticking again after 30 days and the judge doesn't resolve the motion? I don't agree with that proposition. And the reason is that case, the name is escaping me now, I think it was Sutter, the counsel had told the district court essentially, we don't really have any discovery disputes. But if some arise, we'll come back to the court. And on top of that, it was not continued to a date certain, so there are two things going on. It was an empty motion. It really wasn't a dispute, and there was no continuing the motion to another hearing date. I suggest here we've got both things, not just one. We've got a real live dispute, and each point along the way, we're continuing it to the next motion hearing date set. So that's my position on that point. May I ask you about the sentencing issue that Ms. Bader raises? I didn't see any response to it in your brief. Did I overlook it, or did you overlook it, or what's the story on that? I am not sure that I understand what the sentencing – I think that's part of the new trial motion, that it's an ineffective assistance of counsel not to – I understood that there was an improper – she alleges there was an improper six-level bump, or double counting, or something of that sort. I don't believe that's raised as a stand-alone issue in the appellant's opening. Well, it may not have stood alone, but it stood in there someplace. As I understood the structure of the brief, it's ineffective assistance of counsel not to test that. In any case, do you have any response to her claim that there was sentencing error? I don't believe there was sentencing error. Why not? I'm taken a little bit by surprise by this, because I thought I had covered this on the ineffective assistance of counsel claim. Well, again, I looked in your brief. She raises a problem with sentencing. I looked in your brief to see a response, and I didn't see one. If it's there, it's there. Just aim me to the page that has your discussion of the sentencing. This is on page 67 of our brief, and that's essentially the claims under the I deserve a new trial for ineffective assistance of counsel are a whole bunch of different claims, including a sentencing claim, which is, I think, what Your Honor is pointing to. She brought up Guideline 3A12C1. Is that what your brief addresses on page 67? It doesn't address it in detail, and the reason it does address it . . . It doesn't address it at all? No, Your Honor, because I don't think it's a stand-alone sentencing issue. It's an issue subsumed under I deserve a new trial because there was ineffective assistance of counsel. Is the sentence before us or not? No, it's not. That's why I'm having a little bit of disconnect with Judge Silverman, because I don't think it's raised as a stand-alone issue. It's raised as, I deserve a new trial because there was ineffective assistance of counsel because there was sentencing error. That doesn't make any sense. Doesn't that put . . . Sentencing error is mentioned. Doesn't that put that issue before us? Well, it has to be decided in terms of the ineffective assistance of counsel rubric under which it's brought. That's my point. That's my point. Now, if the Court has any doubts about that, I'd be happy to address that issue. I just thought, logically, that's how it had to be addressed, as an ineffective assistance of counsel under the new trial motion. It was brought to the District Court under that rubric, and that's what we defended. Well, the issue that's raised, I believe, is that the enhancement, the additional six points for assaulting a law enforcement officer in a way that created a substantial risk of bodily injury, the ramming of the vehicle was added to the base offense levels for both the marijuana counts and the illegal alien counts. And the question under existing law is whether that double counts those six points. My honest answer is I don't know the answer to that question. But it was in the brief. She titled it, and his attorney failed to adequately represent him at sentencing, and the District Court erred in imposing. So that is a stand-alone. She's saying the attorney was ineffective, and the District Court erred in imposing sentence. So that was not captured in the IAC as a separate claim. And so if you didn't respond to it as a separate claim, then it's kind of a confession of error. I would disagree, and the reason I would disagree is because when you have questions presented for review and it's not listed as a stand-alone issue on the question presented for review or in the summary of argument, this was a massive amount of work to respond to this, and I tried to do the best I could to assess it. That's what your job is. I understand that, Your Honor. But when it's not listed as a stand-alone issue and the questions presented for review were in the summary of argument, and you understand it logically as being part of the ineffective assistance of counsel claim, that's how I tried to address it. Now, in terms of the facts of the matter, the District Court heard all the evidence in this case. If it's a legal issue about double-counting, as Your Honor has indicated, that's one thing. In terms of the facts for it, the District Court was there,  That's a legal issue, whether or not the District Court heard it. I concede I didn't address that legal issue, and I gave the Court the reasons why I didn't. I would be happy to brief the issue for the Court if the Court would like the government's input on that. I would suggest we didn't waive anything because of the reasons I've given just now. Can I ask you a question about the identification of Mr. Mendoza? As I understand the record, not long after the incident that night, the material witnesses who were rounded up at the scene were shown a photograph, a single photograph of Mr. Mendoza. They did not recognize him. Then later they were shown a lineup, and most of them identified him from the lineup. Are there cases which suggest that the showing of a single photograph like that is appropriate and not unduly suggestive? I think the answer is a little bit of a nuanced one, which is it's not favored. It can be a problem. And I think everyone recognized, the District Court, the government, recognized it could be a problem. But a couple things. One, what Officer Barraza asked at the time was not, is this the driver or something like that. It was, do you recognize this person? And they answered no at the time. This was immediately after the accident. There's some later evidence that indicates, including trial evidence, that the material witnesses were afraid and had been specifically instructed not to identify Mr. Mendoza or anybody else involved. And the District Court rightly looked at that. And then the final thing I'd say is, if you think about it, when the District Court heard these motions, he didn't know that there was not going to be a jury trial. That came up, the bench trial issue came up later. And he expressly said, well, we may have to have a hearing outside the presence of the jury on this. We'll just have to wait and see. It turned out when there was a bench trial, they didn't have a hearing, and all that evidence came out in front of the District Court. And I suggest that makes a big difference, because if you think about it this way, the District Court is eyeballing the material witnesses on the stand as they're eyeballing Mr. Mendoza. And there's a dynamic in the courtroom that's going on that's almost entirely independent of that ID and the show up and the six-pack lineup. And the District Court, when it rendered its verdict, mentioned they were afraid to testify. So I'm going to suggest that, no, it's not favored practice, and everybody concedes that, but in the particular circumstances of this case, it should not be an issue. After the trial, did the agency, was it DEA, did they pay the witness for her testimony? They did. Oh, no, no, I'm sorry, I answered the question too quickly. They did pay her. She was an ongoing DEA informant. She had been paid prior, and on the day she testified, apparently, unbeknownst to the prosecutor and according to the DEA agent, unbeknownst to the witness, when she testified, they didn't know that she was going to be paid that day. But then she walked over to the DEA office, signed another cooperation. You may not have known she was going to get the check that day, but did she know she was going to get some money? I honestly don't know the answer to that question. It would be an odd coincidence if right after she testifies, they suddenly write her a check, so she must have had some experience. She had an ongoing relationship with the DEA, and that was disclosed. Was it disclosed that she was getting paid? Yes. She had already been paid, I believe it was $550, and that was disclosed, and that she was signed up, so to speak. $550 for this case or for another matter? As I understood it, the cooperation that she was involved with was for DEA matter, not necessarily for this case. I don't know whether there was some overlap between the two, but it was not specifically for this case. How did it come to light that she was paid for this case after the trial? Did you disclose that, or did they stumble on it? It was kind of both. And the reason I say that is because what happened was the defense counsel interviewed Ms. Sanchez. She said, well, I had three agreements with DEA, and the assistant who was in charge of the case at the time said, well, I'm only aware of one. So he went back and looked at why is she saying now three agreements, and then he found out that there was one cooperation agreement that he knew about, and there was another one, the second one, signed on the day that she testified, after she testified, along with some payment. And there was one one or two years later. So it came out in the course of discovery on the new trial motion. I hope that answers your question. One other sequencing question. When the material witnesses identified Mr. Mendoza through the lineup, were they told before that that if they cooperated with the government, they could stay in the United States? I don't believe so, Your Honor. I don't think there was ever an explicit promise, and the USA has stated that on the record, that these witnesses could stay in the United States. That's the ultimate result, though, isn't it? My understanding is that some of the witnesses are still in the United States. One has left. But my understanding also is that there are issues of ongoing threats, and that's part of the reason. Never any suggestion that I'm aware of that. Material witnesses were crossed on their identification and on the benefits they were to receive, and we've cited the cross in the papers. That was brought up to the trial court. It didn't dissuade, so to speak, the trial court. Is there testimony in the record of the trial concerning the procedures utilized in putting together the lineup that was shown to the material witnesses? I don't believe so. Those officers did not testify. Is that correct? Well, the officers testified, but I'm not sure they testified as to the procedure they used. The actual six-packs were in evidence, and I think we've submitted those, and so you can see whether there's somebody who sticks out like a sore thumb or not. But again, I suggest that when you think about the fact that the district court has this kind of intervening or, I don't know, supervening experience with the witnesses and the defendant. And the other thing I'd point out about that is it's not just the photographic identifications that make a difference in this case. There was a lot of testimony about what happened at the staging house and certain names were used, Martel and Juba. If you think about that, that's entirely apart from the photographs and the IDs from the six-pack or the IDs in the courtroom. Counsel, do you have the opening brief with you? I do. Could you look at pages 81 and 82? It appears that the defendant's counsel was talking about the double-counting issue there, not in conjunction with ineffective assistance of counsel, but challenging the calculations. Well, Your Honor, the heading is Mr. Mendoza is not guilty of the crime charged and his attorney failed to adequately represent him at sentencing. And the district court. That's the heading and then there's the text. The text says what Judge Rawlinson says it says. I understand that. Let's say you overlooked it. You know, we can understand that. It's a big brief, you know. I don't know if overlooked is one way to put it. In other ways, logically I understood it as being an ineffective assistance of counsel claim. And if it's my mistake, I apologize to the court. I'd be happy to brief the issue. As I understand what occurred during the trial, again back to the identification issue, the material witnesses were shown a photograph, the one that apparently they had identified Mr. Mendoza from in the lineup. And then after that they were asked whether Mr. Mendoza was present in the courtroom. Yes. Isn't that unduly suggestive? I would suggest no because what he was doing, what that testimony was, was didn't you pick somebody out of the lineup? Isn't this the one? That, as I understand it, is admissible under federal rule of evidence 801. I think it's D3. I may not have it exactly right, but I cited it in the brief. So that's one thing. And then the courtroom identification is another. I don't think that in itself is suggestive or unduly, certainly not unduly suggestive. And, again, I would point to the, in a sense, fortunate here. We've got the district court judge rather than a jury, and he can see the dynamics and he thought the testimony, as he put it, was corroborated, consistent, and credible. Is there any case law that suggests that that form of courtroom identification of a defendant is appropriate?  I do know there was a complaint that that testimony of using the six-packs itself was inadmissible, and I thought under the federal rules, no, it is admissible, and that was the response I made. Were you trial counsel? No, it was not, Your Honor. Anything else? No, Your Honor, unless the court has questions that I can hopefully shed some light on. Thank you. Ms. Bader has, what, two and a half minutes left? Ms. Bader, keep your eye on the clock, would you please? Okay, I have a lot to say. There have never been any threats that have ever been articulated or given out in discovery. I think this is a continuum of the hyperbole and false accusations continuing even into this appeal. I find that very troubling by the government. They did produce last week, seven years after this case came out, a new set of discovery for me from one of the case agents' reports saying Martel Valencia had threatened Christy Sanchez's family. I didn't bring it yet before the court because I just got it. I'm still ruminating, but he threatened Christy Sanchez. Why wasn't this produced years ago? It's not different from the Stevens case. This was produced seven years after the trial. It's outrageous. I would like to address one more point, Your Honor, with the procedures used. The entire procedures throughout the whole case from the beginning, the arrest, the pretrial motion, in trial with regard to identification was unduly suggestive. What happened in the reports that you can see in my reply brief and in the record, you can see that Andy Calls used the word kill four times. He was looking out for dangerous wrong-way drivers. He told these Matwits they could be killed themselves. They validated them and said thank you for your identification when it was finally over. This was after they even wrote in their reports that they were disappointed that at first the material witnesses were not cooperating with them. They used the word cooperating. What these reports reveal is that they make the deals there in the Border Patrol Station before they ever even get to court. These people are in custody for 10 days. The trial testimony showed they'd been handcuffed. These are witnesses. They'd been handcuffed and put in jail cells, hard cells. They call them that in their report. The agents call them. They were in their hard cells, and we went to talk to Mr. Carrillo. Agent Call said to him, I know that the other two material witnesses think you're the smuggler, but we don't think you are. Basically, they're putting all the witnesses together and telling them what to say and who's going to be implicated. They made the deal right there. They were saying, just like they did with Christy Sanchez later, you implicate Giovanni Mendoza, and then you'll get out of this. That's the deal. That's the problem here. And then you have the lie in the unduly suggestive motion hearing where the government attorney, not this one, the other government attorney tells Judge Sabra, Agent Call personally told me there was nothing unduly suggestive that happened, when his own reports prove it. Thank you, Ms. Bader. Okay. Ms. Hoffman, thank you. The case just argued is submitted. We'll stand and recess. Thank you. All rise. This court for this session stands adjourned.
judges: Tunheim, Silverman, Rawlinson